UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

                                              Dkt. No. 18-CR-427

      v.

MICHAEL BONANNO,

                     Defendant.

-----------------------------------------------------X

**<u>SENTENCING MEMORANDUM</u>**

Edward V. Sapone, Esq.
Chase S. Ruddy, Esq.
Sapone & Petrillo, LLP
*Attorneys for Defendant*
*Michael Bonanno*
One Penn Plaza, Suite 5315
New York, New York 10119
Telephone: (212) 349-9000
E-mail: edward@saponelaw.com

## <u>TABLE OF CONTENTS</u>

**Page**

I.      Introduction .................................................................................................1

II.     Mr. Bonanno's History & Characteristics and the Nature &
        Circumstances of the Offense (§3553(a)(1)) ...........................................3

        a.      *Mr. Bonanno's History & Characteristics* ...................................3

        b.      *Nature and Circumstances of the Offense* .......................................13

III.    Remaining Factors of 18 U.S.C. §3553(a) ...........................................17

        a.      *The Need for the Sentence Imposed to Reflect the Seriousness*
                *of the Offense, to Promote Respect for the Law, to Provide*
                *Just Punishment for the Offense, and to Avoid Unwarranted*
                *Sentence Disparities* ...............................................................17

        b.      *The Requested Sentence Can Provide Adequate Deterrence, and*
                *Protect the Public from Future Offenses by Mr. Bonanno*..............................21

IV.     Conclusion ...............................................................................................27

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)................................................................................................19

*Griffin v. Wisconsin*,
    483 U.S. 868, 874 (1987).....................................................................................19

*United States v. Booker,*
    543 U.S. 220 (2005).............................................................................................21

*United States v. Knights*,
    534 U.S. 112, 119 (2001).....................................................................................19

*United States v. Nesbeth*,
    (E.D.N.Y., 15-CR-018 (FB)) ..............................................................................19

**Statutes**

18 U.S.C. §3553(a) .......................................................................................... *passim*

28 U.S.C. § 994(j)...................................................................................................23

**Other Authorities**

Alternative Sentencing in the Federal Criminal Justice System,
    *United States Sentencing Commission*, January 2009 ...........................................19

Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom,
    "Criminal Deterrence and Sentence Severity: An Analysis of Recent Research,"
    Oxford: Hart Publishing (1999) ...........................................................................21

David Weisburd et al., *Specific Deterrence in a Sample of Offenders*
    *Convicted of White-Collar Crimes*, 33Criminology 587 (1995) ............................22

Donald P. Green & Daniel Winik, *Using Random Judge Assignments*
    *to Estimate the Effects of Incarceration and Probation on Recidivism*
    *among Drug Offenders*, 48 Criminology 357 (2010) ............................................22

Michael Pinard, *Collateral Consequences of Criminal Convictions:*
    *Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010) ....................... 19

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice:
    A Review of Research 28-29 (2006) ...................................................................................... 22

Michelle Alexander, The New Jim Crow 142 (2010) ................................................................. 19

*Recidivism and the 'First Offender": A component of the Fifteen Year*
    *Report on the U.S. Sentencing Commission's Legislative Mandate,*
    United States Sentencing Commission, May 2004 ................................................................ 22

Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime:*
    *Can Both be Reduced?,* 10 Criminology & Pub. Pol'y 13, 37 (2011) ................................... 22

United States Sentencing Commission Sourcebook of
    Federal Sentencing Statistics for Fiscal Year 2018 ............................................................. 21

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of*
    *Punishment*, The Sentencing Project (November 2010) *available at*
    http://www.sentencingproject.org/doc/Deterrence% 20Briefing% 20.pdf ............................. 22

## I.        Introduction

As counsel to Defendant Michael Bonanno, I offer this memorandum to assist the Court to arrive at the appropriate sentence, which I strongly believe is a three-year term of probation, with eight months home confinement, and 300 hours of community service.

Mr. Bonanno accepted responsibility on January 25, 2019, to counts one (bank fraud) and two (conspiracy to commit bank fraud) of a three-count information (18-CR-427). The Government, Probation and I agree that the advisory Guidelines range is 37 to 46 months of imprisonment (Offense Level 21, CHC I). The Probation Department believes that a Guidelines sentence is greater than necessary and recommends a below-Guidelines sentence of 24 months of imprisonment. While we agree with Probation that the factors of 18 U.S.C. §3553(a) call for a below-Guidelines sentence, we believe that a non-incarceratory sentence with the above recommended conditions will satisfy the goals of sentencing and the parsimony clause. While we stand by the Guidelines analysis recommended by our plea agreement, the requested sentence would be consistent with the Guidelines based on the actual loss caused by Mr. Bonanno's participation in the offense (Zone B, Offense Level 11, CHC I).

My hope is that this memorandum, coupled with my arguments at sentencing, will adequately demonstrate to Your Honor that this is a case in which the Court's analysis of the whole person being sentenced and the kinds of sentences available should result in a creative, non-custodial sentence that satisfies the parsimony clause while respecting the goals of sentencing.

Mr. Bonanno has learned a very difficult and valuable lesson. He is a hard-working and devoted husband and hands-on father to three young children, who is riddled with regret over his actions and desires to live the rest of his life as a positive and contributing member of the

community. He is someone who, despite his error in judgment, otherwise served the community as a police officer without incident for nearly 18 years, and has been an outstanding father who shares a very close and special bond with his children.

As the Court considers the whole person whom it will sentence, we wish to highlight the unique facts and circumstances of Mr. Bonanno's life:

(1) **Family Man** – Mr. Bonanno's three children: A██ (12), L██ (9) and B██ (7), rely on him tremendously. L██ requires speech therapy for stuttering, and has demonstrated an added need for Mr. Bonanno's support;

(2) **Service to His Community** – The instant misconduct aside, Mr. Bonanno served faithfully as a member of the NYPD from 2001 until earlier this year following his guilty plea. He was known by his fellow officers, friends and neighbors, as someone who always was willing and eager to help anyone in need. He was recognized for his dutiful service as a member of the NYPD's 6th Precinct, and for his service as a member of the missing persons squad and crime stoppers, among other posts. Mr. Bonanno was also one of the many brave officers who assisted in the aftermath of 9/11, as a result of which his respiratory and gastrointestinal health has been compromised;

(3) **No Risk of Recidivism** – Mr. Bonanno is a 45-year-old first-time offender with zero criminal history points who has accepted full responsibility and has been a model citizen since his arrest 17 months ago; social science research supports the conclusion that he presents a very low risk of recidivism; and

(4) **Nature & Circumstances of the Offense** – the circumstances surrounding Mr. Bonanno's participation in the instant offense underscore the aberrational nature of the crime. He ran into co-defendant Domenic Aiello, a friend from 20 years earlier. Aiello tricked Mr. Bonanno with a sob story regarding his financial situation, and Mr. Bonanno felt compelled to help. In return for Mr. Bonanno's help, Aiello offered to pay some of Mr. Bonanno's bills from his deceased father's account. Over the course of the following three months, in exchange for cash provided by Mr. Bonanno, Aiello made payments to Mr. Bonanno's credit cards and mortgage, and gave Mr. Bonanno a number of purported "rent" checks, virtually all of which were returned unpaid. Mr. Bonanno became suspicious after Aiello's payments to Mr. Bonanno kept bouncing. Mr. Bonanno then consciously avoided learning the truth that Aiello was lying to Bonanno and had involved Bonanno in fraud. While the Guidelines account for $1,457,642 in attempted payments to Mr. Bonanno's accounts, the reality is that his conduct resulted in actual losses of only $15,686.22, while he paid Aiello approximately $15,000 in cash, and suffered numerous fees, expenses, and interest relating to his overdrawn credit cards. The result, is that Mr. Bonanno, far from profiting from his criminal conduct, actually lost money.

As discussed in greater detail below, the factors of 18 U.S.C. §3553(a) demonstrate that the requested sentence meets the ends of justice.

## II.  Mr. Bonanno's History & Characteristics and the Nature & Circumstances of the Offense (§ 3553(a)(1))

*a.  Mr. Bonanno's History & Characteristics*

Michael Bonanno was born in Jackson Heights, Queens. His Father was a foreman in the painters union; his mother was a homemaker. Both suffered from alcoholism leading to their untimely deaths. His father died at the age of 49 from complications associated with alcoholism. His mother died not long after, at the age of 54, from kidney failure.

For the first seven years of his life, Mr. Bonanno, his parents, and his three siblings, resided with his grandparents in Astoria, Queens. The family of six then moved into a nearby one-bedroom apartment, where they lived until Mr. Bonanno was 19. The small apartment was crowded, and Mr. Bonanno and his three siblings were all forced to sleep in the living room. Mr. Bonanno and his younger brother shared the couch, while the two girls slept on a makeshift bunk bed their father built.

Mr. Bonanno and his siblings made due with the bare essentials, and the family home often devolved into chaos as a result of his parents' drinking. His mother, in particular, drank throughout the day while the children were at school, and drank to excess on a daily basis. Beer cans were routinely hidden in the washing machine or under the sink. On some occasions, when Mr. Bonanno was playing in the street with his friends, she would come out of the apartment visibly drunk and stumble to the store to buy more booze. At times she even passed out on the sidewalk.

When Mr. Bonanno's mother was inebriated, which was most of the time, she would pick fights with his father. On some occasions, those fights became violent, and on one occasion, Mr. Bonanno recalls his mother being "knocked out" by his father. When his parents fought, Mr. Bonanno was the one who typically tried to step in and stop it. At other times, when he got home from school, he would seek to hide his parents' liquor bottles in an attempt to prevent the inevitable fight that would happen if the two continued drinking into the evening.

Mr. Bonanno's mother also suffered from depression throughout his childhood, which she perhaps sought to self-medicate with the excessive drinking. At times, however, she reached such a low point that she became suicidal. Mr. Bonanno recalls an instance when he was only nine: he came home from school and found that his mother had cut her wrist. Mr. Bonanno was the one who had to call the police and watch as his mother was taken away in an ambulance.

He found it difficult to stay focused in school, and was often distracted and concerned for his mother. He barely received passing grades in the ninth and 10th grades at Long Island City High School. The Family then moved to Bensonburst, Brooklyn, where Mr. Bonanno attended Lafayette High school during his third and final years. There, his grades improved some, and he graduated in 1994.

By that time, however, his father began to suffer health problems associated with his long history of alcoholism; he was unable to work consistently. Mr. Bonanno made the difficult choice to forsake college, at least initially, to work, so he could help support his family while his father remained out of work. He also became responsible for taking his father to all of his medical appointments until he died a few years later.

According to Barbara Jaeger, one of Mr. Bonanno's cousins: "Even though Michael was not the oldest of his siblings, he took over the role of his father in the family. He would look out

for his sisters and brother and helped them if they needed anything. They would go to him for advice and he never turned them away. Michael willingly took over this responsibility because he is a caring, loving brother and truly wanted to see his siblings have a normal life." (Exhibit A).

Always a hard worker, Mr. Bonanno landed a job in 1993, during his junior year in high school, as a stock clerk at Genovese Drugs, a family-run drug store. After graduating, he was promoted to assistant manager. He was largely in charge of maintaining the inventory and remained in the position for a year and a half. Then, in January 1996, Mr. Bonanno was able to secure a position as a paraprofessional with the New York City Board of Education. For five and a half years, he worked with learning disabled students in a Specialized Instruction  Environment (SIE VII). He assisted the classroom teacher, and helped to resolve classroom crises.

According to his wife, Donna: "Michael worked one on one with students who came from struggling homes. He supported students in numerous ways. For example, Michael would accompany students to school by meeting them at their home in the morning and riding the school bus with them. Additionally, he would ride the school bus back home with them at the end of the day. Students felt safe with Michael." (Exhibit B).

This is echoed by Grace Saphire, one of Mr. Bonanno's co-workers at P.S. 231k and P.S. 215k: "He had such a warm, caring way with the students, and he was a good role model for them. He worked very well with the teachers, paraprofessionals and supervisors." (Exhibit C).

While working at an elementary school in Staten Island, Mr. Bonanno met Donna, who, at the time, was student teaching at the school. The two began dating, and in October 2002, they married.

While Mr. Bonanno enjoyed working in the classroom as a paraprofessional, especially the reward of working with special needs children, he had always dreamed of becoming a police officer and serving our community. According to Donna: "[f]rom the moment I met Michael all he wanted to do was become a NYC police officer. It was in his blood. Michael dedicated himself to help people." (Exhibit B).

While working for the Department of Education, Mr. Bonanno had the opportunity to take college classes paid for by the DOE. He began taking a few courses at a time, on nights and weekends, at Kingsborough Community College, until he had accumulated the requisite 70 credits to apply to the Police Academy.

Mr. Bonanno first applied, and was accepted, to the Police Academy in 2000, but failed the final exam. Undeterred, he repeated the academy the following year, successfully completing it and, in July 2001, he joined the NYPD as a patrol officer at the 6th Precinct. According to his wife, it was "one of the happiest days of his life." (Exhibit B).

Mr. Bonanno was on the job less than two months when the Towers were attacked, and he rushed in to help in the immediate aftermath. According to his wife, Mr. Bonanno "worked tirelessly day and night at the [ground zero] recovery site." (Exhibit B). As a result of his time at Ground Zero, he has developed several health complications, for which he has qualified for medical care through the World Trade Center Health Program (*see* Exhibit D), including chronic sinus infections, obstructive sleep apnea and gastroesophageal reflux disease (GERD). (*See* Exhibit D). He underwent nasal surgery in 2017 to repair a deviated septum. The surgery brought about only limited improvement. He is required to use a CPAP machine nightly to prevent dangerous drops in his oxygen levels while he sleeps, and he uses a nasal steroid inhaler daily. He is currently scheduled for a second surgery on July 12, 2019, to address continued issues with

his breathing and sinuses. (*See* Exhibit E). He also continues to suffer from hiatal hernia, which causes him reflux and pain on the right side of his chest. He takes Ranitidine daily to manage the symptoms.

Mr. Bonanno fought on to engage in a nearly 18-year career with the NYPD. He served as a patrol officer at the 6th precinct until 2004, when he joined the Grand Larceny Task Force. Donna Bonanno describes the impact that Mr. Bonanno had, helping many people in the community, and the relationship he had with the people he served: "Michael made sure he knew everyone and let the community know if they needed anything he would be there for them. He still has many friendships from his time at the 6th Precinct, not just police officers but community members." (Exhibit B).

Angela Tsikis similarly shares: "I remember early on when getting to know Mike how impressed I was with his passion for his work. I remember thinking I want to find a career that will make me as excited and invested in what I'm doing as much as he did. [...] His passion for helping and protecting people came through in every interaction he had with people." (Exhibit F).

After two years on the Grand Larceny Task Force, he was promoted to Detective, and worked out of the 6th Precinct Detective Squad, investigating primarily burglaries and robberies. After two years there, in 2008, Mr. Bonanno joined the Missing Persons Squad, where he spent the next seven years. This posting also had a profound effect on Mr. Bonanno. According to his wife: "Michael worked with many families in helping them find loved ones. The heartbreaking stories never got to Michael because he knew what he had to do, bring families together. That meant more to Michael than anything especially since he is a family man." (Exhibit B).

In 2015, Mr. Bonanno transferred to the Crime Stoppers Unit, where he worked until his arrest in this case. Following his arrest, up until his guilty plea, Mr. Bonanno worked as a court officer in the New York City courts. He was terminated by the department following his guilty plea.

Mr. Bonanno was a well-respected member of the NYPD, who did much good for our community. For example, in 2007, he was recommended for a commendation by one of the citizens for whom he helped get justice following a brutal assault. In a message sent to then Police Commissioner Raymond Kelly, Glenn Berman wrote:

> My wife Bernadita Berman who suffered a stroke a year ago and now walks with a cane, was brutally assaulted last week (Wednesday August 22, 2007 6:45am) by four thugs. Three of the four criminals have been apprehended, thanks to the unrelenting officers of the 6th precinct, I would especially like to name the two detectives Michael Bonanno and James Walsh for the quick apprehension of these thugs. My wife is doing well and does not feel the part of a victim, thanks to these detectives and the 6th precinct officers, they have given her the ability to fight back and see justice done. Please see to it these detectives get the recognition they truly deserve.

(Exhibit G).

On another occasion, in 2005, when Mr. Bonanno was working as a member of the Grand Larceny Task Force, he received a commendation from the United States Postal Inspection Service for his assistance in the apprehension of a suspect. In a letter to Police Commissioner Kelly, US Postal Inspector S.V. Comparato wrote:

> On April 6, 2005, I was in Battery Park City when I received a call advising me unidentified subject was recognized from photos and was currently fleeing eastbound on 12th Street. I immediately contacted Officer Bonanno and requested assistance. Because of their quick response and initial on scene investigation, I was able to execute my federal arrest warrant and arrest FNU LNU a/k/a "Mer Bellamy" later identified as Adnan Touzami. With evidence recovered from the scene and evidence gathered throughout the

> past six months, Mr. Touzami is cooperating with the Federal Government and we estimate several more arrests and the demise of a Moroccan Identity theft crew. Please extend my wishes on a job well done.

(Exhibit G).

James Gillespie, who worked as Mr. Bonanno's partner for a time on patrol in Greenwich Village, shares his observations of what a devoted officer Mr. Bonanno was: "I was impressed with his calm reassuring demeanor and willingness to help others, under all circumstances. He was always the first person to offer assistance or aid to both the general public and his fellow officers. […] Mike lives his life to serve others, sometimes at great expense to himself. He is a model human being and a true family man. […] I am proud to have served as his partner in the NYPD and prouder to call him a friend." (Exhibit H).

This sentiment is echoed by Karen Pan, who partnered with Mr. Bonanno as part of the Manhattan South Grand Larceny Task Force, and who worked with him again as a member of the 6th precinct detective squad: "If I needed or if anyone needed assistance with anything he would be the first to volunteer. He stayed past his scheduled hours on numerous occasions while never complaining. He always made sure that everyone was taken care of. […] Michael Bonanno is an extremely generous person […]. He is well spoken of by all those who were lucky enough to work with him." (Exhibit I).

In addition to his history as a dedicated police officer, Mr. Bonanno has shown that he is a devoted family man. He and his wife have worked hard to build a successful life together. Mrs. Bonanno now works as an elementary school principal. They had three children: A█ Bonanno (12), L█ Bonanno (9) and B█ Bonanno (7). All three children are in good health, and doing well in school. According to his wife, Mr. Bonanno, in particular, strove to provide the children with the kind of father and household he never had as a child, and to always be there for them.

Mrs. Bonanno describes him as an "excellent parent and spouse, who is highly engaged in the care and activities of their children." (PSR p. 12, ¶71).

Because Mrs. Bonanno has to be at school early in the morning for her role as principal, Mr. Bonanno often arranged to work at night so that he could be there for their children during the day. According to Mrs. Bonanno:

> Being a father was the most important job to Michael. […] When the children began school, it was Michael who would dress them in the morning, do A███'s and B███'s hair with big bows and fancy clips, make their lunch and walk them to school, which he still currently does. Michael attended and attends all their parent engagement activities, including trips and PTA meetings. […] Michael supports our children with their homework and takes them to all their afterschool activities. When we realized our son L███ had a disability it was Michael who found a speech therapist to work with him. Michael attends all of L███'s IEP meetings. […] Not only is school important to Michael, but he makes sure that our children are well rounded. Michael takes them to the park, to the mall, to museums and to the movies. My children always want to be with their daddy.

(Exhibit B).

It is evident to virtually everyone who crosses paths with Mr. Bonanno that he is dedicated to his family. The more than **30** letters submitted to the Court are replete with references to what an amazing father and family man Mr. Bonanno is.

For example, Aaron Bastedo shares: "Michael is and has been a very devoted and loving family man. […] I have witnessed Michael take real caring interest in the lives of those around him and truly care about the well-being of each and every one of those people in his life, especially those of his family and friends. […] I have witnessed him be an outstanding role model and raise his children with principles and integrity." (Exhibit J).

Kevin Valenti, a friend of Mr. Bonanno's for the past 22 years, similarly writes: "Michael always puts family first and his 3 kids are his world. He's a hands on father and there is nothing

he wouldn't do for them. He sits with them everyday and helps them with their school work and is there for them when any problem arises." (Exhibit K).

And according to Patricia McCarthy: "Michael Bonanno is a true family man. I have been in the presence of him and his three children and have seen him interact with them as a father. He has such incredible love for his wife and children and has worked extremely hard his entire life to provide for them. He has made a beautiful home for them in Staten Island. He attends all their school functions, helps with homework and guides them spiritually by attending Mass with them. He is so proud of them and has often had them perform a dance routine or draw a picture for me to showcase their newest achievement." (Exhibit L).

And Mr. Bonanno's love and dedication to his family extends beyond just his immediate family. His brother-in-law, Glenn Baldwin Jr., shares:

> Michael has always made it a point to be there for the family. […] I myself have been the benefactor of Michael's selflessness. My father passed away in 2009 and when I was growing up I made a lot of poor decisions. Michael became like an older brother. Helping me with all the things a young man might need help with. He took me to my road test to get my drivers license. When I was in the hospital Michael would come visit me on his way to and from work. […] He always encourage[d] me to be the best that I can be. He is an easy example of someone to look up to. A professional who serves his community, a loving husband, and a great father.

(Exhibit M).

Daryl Singh, who is married to one of Mr. Bonanno's cousins, similarly writes:

> Michael J. Bonanno is the type of individual that you would want inside your corner. […] When I first joined the military in 2004, neither my wife nor I had anything. Michael was the first person who was willing to help us move from New York to North Carolina. He put the family first, and made sure that we were set up, and had our feet underneath us before he headed back home. As a young Private in the military and just being married, we were unsure what to expect from our first duty station. We didn't know

anyone in the area, and didn't have any family for miles. But Michael was there, he was the family that we needed during that troubling time.

Jump forward to 2007, I deployed to Afghanistan in support of Operation Enduring Freedom, and my daughter was born. Due to the time of the war and mission, I was not able to be with my wife when my daughter was born, however, Michael was the first person to come by to make sure that family, to include my son, was doing good and assisted in any way, shape or form. He's the type of individual that puts family first, and always willing to go out of his way to assist.

(Exhibit N).

And more recently, Mr. Bonanno has taken on the role of care-giver to his wife's father.

According to Mr. Bonanno's sister-in-law Michelle DiNaso:

Besides taking care of his immediate family, Michael takes care of my ailing father. He takes my dad to all his doctor appointments, takes him for breakfast a couple of times a week and sits with him as a companion. There also have been many times in the past couple of years my dad has called Michael for help due to falling in the house. During those times Michael was the only person able to take my father to the hospital for proper care. Recently my dad fell and broke his arm, Michael is the one who took him to the emergency room. Michael makes sure my father is up to date on all of his doctor appointments, medications, as well as hygiene. My father relies on Michael.

(Exhibit O).

This is echoed by Donna Bonanno: "For the past 5 years my father's health has been declining. It's Michael that takes him to all his doctor's appointments. It's Michael that knows which medication my father is required to take. Michael calls my dad every day to make sure he has everything he needs and if he doesn't, Michael is the first one to run to the store and pick up whatever it is that my father wants." (Exhibit B).

Each letter of the dozens comes together to explain a common theme: Mr. Bonanno is a man who has devoted his life to family and community. He has shown himself to be especially

dependable when people have no one else to turn to for a favor. The examples are countless of Mr. Bonanno's generosity of spirit and kind and compassionate nature. They show that he is at heart a good and caring man who strives to help others, and asks for nothing in return.

b.      *Nature & Circumstances of the Offense*

As he approaches his sentencing, Mr. Bonanno continues to accept full responsibility for the crime he committed.

By way of explanation, and not excuse, the circumstances surrounding Mr. Bonanno's participation in the instant offense are mitigating, and underscore the aberrational nature of the crime.

In or around November 2016, Mr. Bonanno ran into co-defendant Domenic Aiello at the Staten Island Mall. The two men had been friends 20 years earlier, but Mr. Bonanno had not seen Aiello in many years. The two men made plans to reconnect soon after. Over coffee, Aiello told Mr. Bonanno that he was going through a very difficult time; he was getting divorced and his personal bank accounts had been frozen as part of the divorce proceedings. He confided to Mr. Bonanno that he was having trouble coming up with the funds for housing and food, among other things. Mr. Bonanno, despite not having seen his friend in many years, felt compelled to help. Out of the goodness of his heart, Mr. Bonanno trusted Aiello and agreed to loan him money.

At first, he gave Aiello several thousand dollars from a personal line of credit that he maintained at a bank in Staten Island. Not long after, Aiello came back to Mr. Bonanno asking for more money. Mr. Bonanno, however, did not have more money to give Aiello. Aiello, who was homeless and living out of a hotel, then suggested to Mr. Bonanno that in return for Mr. Bonanno taking cash advances on his credit cards and giving the cash to Aiello, Aiello would

pay some of Mr. Bonanno's bills from an account he had access to following his father's death. Mr. Bonanno, trusting an old friend, agreed. Over the course of the following three months, Mr. Bonanno gave Aiello approximately $15,000 in cash, most of which he withdrew as cash advances on his credit cards.

In exchange, for the cash provided by Mr. Bonanno, Aiello made a number of telephone payments to Mr. Bonanno's credit cards and mortgage, and gave Mr. Bonanno a number of purported "rent" checks, from a property his late father had reportedly owned. In truth, the account information used by Aiello to make the payments to Mr. Bonanno's accounts was stolen, as were the reported rent checks. Shortly after each payment or each deposit, the payments were reversed, and the checks were returned unpaid. As a result, Mr. Bonanno's credit card debt began to rise, and some of his cards became overdrawn, and were eventually closed. Each time he asked Aiello what was happening, Aiello always had a ready-made excuse. Nonetheless, Mr. Bonanno wanted to give his old friend the benefit of the doubt. This is consistent with the man described in many of the letters to the Court.

According to Vincent Marasia: "I believe that at times, Michael has been blindsided by his good intentions and desire to help others to the point of only seeing the person in need, versus the character of that person. His fault is helping others to the point of sometimes being naïve although kind and generous." (Exhibit P).

This is echoed by Dr. Stephen Wakschal, a licensed clinical therapist, who has been treating Mr. Bonanno since December 2018: "During his course of treatment, I have come to know and understand Mr. Bonanno as an individual who, like most law enforcement professionals, has the tendency to put others first, above his own needs, and puts him at risk for unintended consequences." (Exhibit Q).

I strongly believe that Mr. Bonanno's traumatic childhood served to create a characteristic that hurt him as he tried to deal with Aiello, who was a master manipulator. Mr. Bonanno, from the time he was a small boy, always had to step up and help his parents and siblings in the face of his parents' alcoholism and their financial limitations. He became a somewhat of a protector. Never the smartest guy in the room, Mr. Bonanno always worked hard to help and be there for others. This characteristic was positive in that it led to his helping deal with the students as a paraprofessional, and to his serving and protecting as an NYPD officer. Sadly, it was also negative, as Mr. Bonanno often has been taken advantage of by others. He has demonstrated that he is the kind of man who literally would give a stranger the shirt off his back. So when Mr. Aiello reconnected with Mr. Bonanno, he had found the perfect mark. He peppered Mr. Bonanno with a story about his dead father, needy children, homelessness and despair. Bonanno was, of course, hooked and immediately made it a life's mission to help a friend in need.

It was only after Aiello's payments were repeatedly returned that Mr. Bonanno began to grow suspicious; while he did not actually know that the funds being deposited to his accounts and applied to his credit cards were stolen, the number of red flags eventually reached a point where the reason Mr. Bonanno didn't actually know is because he consciously avoided knowing. This was especially true once Aiello began making large payments to Mr. Bonanno's mortgage, which far exceeded the value of the money he had given Aiello.

In the end, the total value of the attempted payments over the approximate three month period of the offense was $1,457,642. This forms the basis of the Guidelines calculation in this case. While I stand by the Guidelines analysis recommended by our plea agreement, I believe this number overstates the seriousness of Mr. Bonanno's offense conduct for two principled

reasons: (1) that number includes multiple attempts to pay the same bills over and over; each time a payment was reversed, another attempt was made to pay the same bill, often times for a higher amount to encompass interest and penalties associated with the prior reversed payment; in a sense, this would seem to double count payments when considering the intended loss; and (2) at the end of the day, the actual losses attributable to Mr. Bonanno are $15,686.22, which does not account for the more than $15,000 Mr. Bonanno provided to Aiello, or the thousands of dollars in fees, expenses, and interest that Mr. Bonanno suffered to provide Aiello with the cash that he requested. In the end, far from profiting from this crime, Mr. Bonanno lost money from his participation, and his family's finances will be affected for years to come.

The dollar value of the attempted payments drives the Guidelines calculation. The difference between the intended loss and the actual loss, is a difference of 10 offense levels (the difference between a 14-level increase for a loss in excess of $550,000 and a 4-level increase for a loss in excess of $15,000). While we don't dispute the accuracy of the Guidelines calculation in the plea agreement, we instead offer this view under a §3553(a) (circumstances of the offense) analysis. Without those 10 offense levels, Mr. Bonanno's advisory sentencing range would be 8-14 months in sentencing Zone B, which I submit would be consistent with the requested sentence.

None of this is intended to justify or excuse Mr. Bonanno's misconduct, and he understands that he is solely to blame for his choices. However, there is no doubt that Mr. Bonanno's intentions started out as noble and he was lied to and tricked. He subsequently made a terrible decision to bury his head in the sand, and he ruined his and his family's life as they knew it. Nonetheless, he has learned a very important lesson, and his misconduct represents an aberration in a life underscored by hard work and sacrifice for others.

16

### III.  Remaining Factors of 18 U.S.C. § 3553(a)

a.     *The Need for the Sentence Imposed to Reflect the Seriousness*
       *of the Offense, to Provide Just Punishment, to Avoid Unwarranted*
       *Sentence Disparities, and to Promote Respect for the Law*

As the Court reflects upon the person being sentenced, I urge Your Honor to consider that the requested sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities.

Ms. Bonanno's misconduct is not a fair representation of his character. He has proven to a community of people that he is a kind and caring person who, despite a rough life growing up, is always willing to give his time, his energy and his money so that someone else can have it better than he did.

Lucy Accardo, who has known Mr. Bonanno for more than 30 years, describes him as someone who is "always willing to go above and beyond for others and never expects anything in return. His passion for life, for people and for family and community is like very few people that I have ever met in my lifetime[]." (Exhibit R).

Robert Kane, who has known Mr. Bonanno for more than 20 years, similarly shares: "Michael Bonanno has proven to me time and time again to be a person of sincere disposition, a doting husband and loving father, and an integrity of character beyond reproach." (Exhibit S).

According to Aaron Bastedo: "I have always known Michael to be a sincere, caring, dedicated, generous and trusting person in every aspect of his life. Michael has been a fine upstanding citizen and has qualities that every person should strive to have and I am proud to know him […]." (Exhibit J).

Joan Riley-Hausknecht describes Mr. Bonanno as "a good decent man who has brought so much love and happiness to those that know him. […] Everyone that knows him loves him and enjoys being around him." (Exhibit T).

Matthew Morelli, a friend of Mr. Bonanno's who also attends Holy Child Parish in Staten Island, shares: "I've heard his prayers over the years and know that his heart is pure. He selflessly prays for anyone in need. He shows true empathy for others and he would give the shirt off his back to someone in need. I've witnessed him giving to the poor in church and on the street. […] He truly serves his family, friends and community." (Exhibit U).

And Lisa Bastedo, another of Mr. Bonanno's sisters-in-law, shares: "Michael has a heart of gold and tries to help everyone he comes in contact with that needs it. He never turns his back on anyone and is always a positive person to be around. If I had to choose one person for a second chance it would be Michael Bonanno. […] He is the most stand up honest person I ever met." (Exhibit V).

The letters written on Mr. Bonanno's behalf demonstrate that there is a community of people who love and support him.[1] The consistent themes woven throughout the various letters of support highlight Mr. Bonanno's kindness, his empathy, his generosity, and his loyalty. These family and community members know how serious this case is, and that the law carries the power to incarcerate him, yet they ask for leniency, because they know that there is much more to Mr. Bonanno than this case.

The requested sentence will provide just punishment for the offense. For its part, the United States Sentencing Commission has noted that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alterative

---

[1] Additional letters not quoted herein are attached as Exhibit CC.

sanctions for first-time and nonviolent offenders." *Alternative Sentencing in the Federal Criminal Justice System, United States Sentencing Commission*, January 2009, pg. 1.

Requiring Mr. Bonanno to comply with the mandates of the Probation Office for the next three years, including eight months during which he will be confined to his home, still sends a powerful message to the community that crime will not be tolerated. *See Gall v. United States*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty"); *quoting United States v. Knights*, 534 U.S. 112, 119 (2001) ("[probationers are] subject to several standard conditions that substantially restrict their liberty"); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) ("[probationers] do not enjoy the absolute liberty to which every citizen is entitled").

Further, in addition to the obvious consequences Mr. Bonanno will face as a result of the requested sentence, he will also face numerous collateral consequences, including: "ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon disenfranchisement." Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010).

In an opinion by District Judge Frederick Block of the Eastern District of New York (15-CR-18, Doc. No. 43), he underscores that the effects of these collateral consequences can be devastating. As Professor Michelle Alexander has reminded us, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, The New Jim Crow 142 (2010).

Additionally, as a result of his conviction, Mr. Bonanno has already lost a career that he loves and that he aspired to do his whole life, a career that for the better part of two decades has defined who he is. He will no longer be able to serve the community as a police officer for the rest of his life. As Donna Bonanno shares in her letter: "[a]t times my husband feels that he has lost everything (being NYPD detective)." (Exhibit B).

Given these significant collateral consequences, I submit that Ms. Bonanno does not need to be imprisoned to be punished. He has had a challenging life. He grew up in poverty to alcoholic parents. He has worked hard to earn everything he has had in life. He has made tremendous sacrifices in service to his family and community. He is a kind and generous person who has always done what he can for the people in his life. Under the unique circumstances of this offense, Mr. Bonanno made a profound mistake that will follow him for the rest of his life. He has already paid a heavy price for his misconduct.

On balance, no good would come from incarcerating this particular defendant under these particular circumstances. The people who will be affected most if Mr. Bonanno goes to prison will be his family, especially his young children and his father-in-law, who depend on him every day.

According to Aaron Bastedo: "Michael is, and has been, an essential figure to his family and friends. Without him being home to do all the great things he does as a father, husband, brother and friend, will have a long lasting detrimental effect on those around him and be near impossible to fill or replace, even for a short period of time." (Exhibit J).

This same sentiment is echoed by the Jannuzzi family: "Michael is [] a dedicated father, with all three kids at important stages of their lives. […] It would have a drastic negative effect on all three children if they don't have their father around." (Exhibit W).

Finally, the requested sentence would not result in a disparity. An evaluation of the Sentencing Commission's sourcebook[2] is revealing in this regard. Of the 3,458 defendants sentenced in the Second Circuit in 2018, only 1,130 (32.7%) received a within-the-guidelines sentence, while 1,544 (44.7%) received a non-government sponsored below guidelines sentence. (*See* Exhibit X). And of the 1,438 defendants sentenced in the Southern District of New York, only 367 (25.5%) received a within-the-guidelines sentence, while 821 (57.1%) received sentences below the guidelines minimum sentence based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit X).

While every case presents different facts and circumstances, given the unique nature and circumstances of Mr. Bonanno's offense, his remorse and acceptance of responsibility, and the significant collateral consequences he faces, the requested sentence would not represent a disparity in sentencing.

b. *The Requested Sentence Can Provide Adequate Deterrence, and*
   *Protect the Public from Future Offenses by Mr. Bonanno*

A three-year term of probation with eight months of home confinement and hundreds of hours of community service can provide adequate general and specific deterrence.

The available empirical evidence does not support a finding that incarceration leads to increased deterrent effects, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects");

---

[2] *See* United States Sentencing Commission Sourcebook of Federal Sentencing Statistics for Fiscal Year 2018.

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

While we appreciate the need for general deterrence, it appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies. *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?,* 10 Criminology & Pub. Pol'y 13, 37 (2011); *See* Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.

Studies show that the same is true of specific deterrence; except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and a term of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33Criminology 587 (1995)(finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Respectfully, Mr. Bonanno is a low-risk offender who does not need to be incapacitated to be deterred. Social science research indicates low recidivism rates for offenders like Mr.

Bonanno with no prior criminal history. In 2004, the United States Sentencing Commission ("U.S.S.C.") issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004. (*See* Exhibit Y). In its report, the U.S.S.C. notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.

(Exhibit Y, p. 1); *see also* 28 U.S.C. § 994(j).

The U.S.S.C. found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points). (*See* Exhibit Y, p. 13-14, 26).

More specifically, among the category of offenders with zero criminal history points, those offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8% for offenders with a history of arrest and conviction for only "never-count" offenses specified under §4A1.2(c)(2)). (*See* Exhibit Y, p. 14, 26).

The U.S.S.C. notes:

> Its low recidivism rate makes first offender group A stand out. Recall that group A offenders have no prior criminal events, not even a prior arrest.

(Exhibit Y, p. 14).

Mr. Bonanno falls squarely within offender group A; prior to this case, he had never before been arrested, or had any interaction with the criminal justice system. Far from it, he served his community admirably as a NYPD officer. And since his arrest 17 months ago, Mr. Bonanno has remained in full compliance with all of the conditions of his release. Absent this terrible error in judgment, he has lived a thoroughly law abiding life underscored by hard work and sacrifice for others. And he has learned a very difficult lesson from this experience and will carry it with him for the remainder of his life.

For a variety of reasons, including Mr. Bonanno's personal history, the positive steps he has already taken to reinvent himself while on pretrial supervision, and the support he will have from a large community of family and friends, I do not believe that Mr. Bonanno presents any danger of reoffending.

Dr. Stephen Wakschal, the clinical psychologist who has been treating Mr. Bonanno for the past eight months, also believes that Mr. Bonanno does not present a danger of re-offending. According to Dr. Wakschal:

> As a licensed New York State clinical psychologist, holding 3 Master's degrees and a Ph.D. from Columbia University with a career that has spanned over 40 years working in both the public and private sector, I feel confident in my strong clinical opinion that Mr. Bonanno's recent legal struggles are an aberration and in no way are representative of the person he is.

(Exhibit Q).

Mr. Bonanno has committed himself to moving forward in the wake of this case, and to finding ways to continue to be a productive contributor to his family and community. He is committed to continuing treatment with Dr. Wakschal for the foreseeable future. He also has explored several different career possibilities. Since being terminated from the NYPD in February, Mr. Bonanno has worked providing corporate security, in a similar capacity to what he

was able to do to supplement his NYPD pay (*see* Exhibit Z), he shadowed a delivery route for a candy distributor in New Jersey and he has worked with a friend who owns a vegan catering company so that he can learn the ropes of the food service industry in the hopes of starting his own vegan food truck. He even attended classes and received his qualifying certificate in food protection from the NYC Department of Health. (*See* Exhibit AA). He has also continued to be the primary caretaker of his father-in-law, who depends on Mr. Bonanno for most aspects of his daily living.

He has shown that he is both capable of, and intent on, living a law-abiding life. I believe that a prison term would only interrupt the progress Mr. Bonanno has already made in reshaping his life.

Mr. Bonanno has also continued to demonstrate how remorseful he is for the choices that he made and that he remains someone on whom others can count for support. According to Brian Sharkey: "Michael Bonanno expressed a deep sense of remorse in making such a serious mistake and I believe in his ability to pay his debt to society. […] Michael Bonanno has always been an upright character in the community. […] Despite the current case, I still believe Michael Bonanno to be an honorable individual, a valuable member of my community, and a good human being. […] I believe that […] he will emerge a better person […]." (Exhibit BB).

And Donna Bonanno shares an illustrative example that Mr. Bonanno is still the kind, compassionate man he was prior to this offense: "Recently, my neighbor fell ill. Even with the difficult time Michael is presently going through, he supported the family. Michael drove the neighbor's wife to the hospital and when it snowed he shoveled their sidewalk and drive way for them. When Michael would go to the store, he made sure he called our neighbors to see if they

needed anything. Through hard times, Michael is still true to who he is, a wonderful and caring man." (Exhibit B).

Respectfully, the public does not need protection from Mr. Bonanno. His lifetime of sacrifice and service, history of hard work, care and compassion for others, remorse and anticipated supervision, all make him unlikely to reoffend.

Therefore, for all these reasons, a sentence of three years of probation with eight months of home confinement and 300 hours of community service can keep Mr. Bonanno with his wife and children and earning an income to help support them while satisfying the goals of sentencing.

## IV.  Conclusion

On behalf of Mr. Bonanno and his family, I thank the Court for taking the time to consider our sentencing submission. We look forward to addressing the Court at the time of sentencing.

Dated:        New York, New York
              July 9, 2019

                                        Respectfully submitted,


                                        /s/ *Edward V. Sapone*
                                        Edward V. Sapone


cc:     A.U.S.A. Nicolas Roos
        A.U.S.A. Danielle Sassoon