

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 16, 2019

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    ***United States v. Michael Bonanno*, No. 18 Cr. 427 (PGG)**

Dear Judge Gardephe:

      The defendant, Michael Bonanno, is scheduled to be sentenced on July 23, 2019 at 4:30 p.m., following his guilty plea to bank fraud and conspiracy to commit bank fraud. The Government respectfully submits this letter in connection with the sentencing and in response to the defendant's sentencing submission date July 9, 2019 ("Def. Mem.").

      The defendant, a detective with the New York City Police Department ("NYPD"), who at times had been tasked with investigating the very crimes he committed, perpetrated a months-long bank fraud that exposed victims to over a million dollars in losses. This crime was not committed because the defendant "felt compelled to help" and was the "perfect mark." (Def. Mem. at 2, 15.) The defendant was motivated by greed. He promised to "help" in exchange for having his credit card debt and mortgage paid, and pushed his co-conspirator to arrange over sixty fraudulent transactions for the benefit of the defendant. And in entering into this corrupt bargain, the defendant violated the duty vested in him to serve the public. Yet despite this shameful conduct, when the banks began freezing his credit cards and closing his accounts, and law enforcement started making inquiries, the defendant disclaimed responsibility and – as he has once again done in his sentencing submission – claimed victimhood.

      As set forth in the Probation Department's Presentence Investigation Report ("PSR"), the applicable United States Sentencing Guidelines ("Guidelines") range is 37 to 46 months' imprisonment. This range reflects the defendant's deliberate and serious criminal conduct, and a substantial prison term is required to vindicate the purposes and principles of sentencing as set forth in Section 3553(a). For these reasons, a substantial term of imprisonment would be sufficient but not greater than necessary to provide just punishment, to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, and to afford adequate deterrence to the defendant and others in positions of trust and consequence who might be tempted to make the same choices.

I.      **Factual Background**

    **A.  Offense Conduct**

    While a detective with the NYPD, the defendant—with his co-conspirator Domenic Aiello—stole bank account information and checks from multiple victims in the New York City area.   The defendant and Aiello used that account information and those checks to make unauthorized transfers and deposits to the defendant's bank accounts, including to pay off the defendant's credit card bills and attempt to pay off his mortgage.   In return for making these payments to the defendant's accounts, the defendant paid Aiello thousands of dollars in cash.

    Prior to carrying out this scheme, the defendant and Aiello had been longtime friends who had lost touch.   The two men reconnected after years out of contact when they ran into each other at a mall in Staten Island.   At that time, Aiello was broke and needed money to settle personal debts and cover living expenses.   The defendant was experiencing his own financial difficulties from having a large mortgage and credit card debt.   Shortly after reconnecting, the defendant and Aiello agreed to assist each other in dealing with their respective financial troubles.   The defendant agreed to pay Aiello several thousand dollars in cash, which the defendant and Aiello deemed to be a short-term loan, and Aiello agreed to use bank accounts—the numbers of which were stolen— to pay down the defendant's credit card bills and mortgage.   Over the next several months, the defendant and Aiello attempted over thirty unauthorized ACH payments toward the defendant's credit card debt and mortgage using stolen bank account numbers.   The defendant and Aiello, both together and separately, typically made those payments over the phone by calling the defendant's credit card companies, providing stolen bank account numbers as the method of payment, and then lying about the owner of the paying account.   Many of the calls were recorded.   On those calls, the defendant repeatedly asked whether transactions had cleared, followed up regarding reversed or "bounced" transactions, and pushed bankers to make funds from pending transactions available.

    The defendant and Aiello also deposited stolen checks into the defendant's bank accounts. Aiello obtained those checks – and the bank account numbers used to make the ACH transfers – by stealing mail from mailboxes.   On more than one occasion, in the middle of the night, the defendant drove Aiello to steal mail.   Aiello searched the stolen mail for victims' bank account information and blank checks.   Aiello met with the defendant to fill out the stolen, blank checks, making them out to "cash" or to "Bonanno."   The defendant took the checks and deposited them into his checking and savings accounts.   In exchange for facilitating the ACH payment and deposits to the defendant's accounts, the defendant made purchases for Aiello and paid Aiello in cash, periodically giving Aiello several hundred or several thousand dollars at a time throughout the duration of the scheme.   Throughout the course of the scheme, many of the fraudulent payments made by the defendant and Aiello were reversed.   Before those payments were reversed, the defendant used the paid-down credit cards to purchase consumer goods and airline tickets, and to take cash advances.   The defendant also told Aiello to pay the bills of the defendant's brother and a friend.

    As set forth in the defendant's sentencing submission, Aiello told the defendant several lies about the source of the funds, but throughout the scheme there were myriad indications that the funds Aiello was using to pay the defendant's bills and mortgage were stolen.   Among other things:

- The sheer number and volume of the transactions was suspicious, particularly for someone who initially told the defendant he was broke and needed a loan. Aiello and the defendant attempted approximately 67 payments, worth approximately $2,000,000 in the span of just six months. Several of the attempted payments were around $500,000 at a time.

- Aiello initially told the defendant that the accounts used to pay the defendant's bills belonged to him, but at the same time he made clear he could not access the money in those accounts directly, and needed cash from the defendant in exchange for the attempted payments from these accounts. Not only did Aiello not have access to a bank account, he asked the defendant to rent a car for him and to pay his hotel bills because he had no credit card. In addition, he was living out of a mediocre hotel, and downgraded hotels in the middle of the scheme. Moreover, he was prepared to accept amounts of cash from Bonanno that were a tiny fraction of the total amount of the attempted transfers to the defendant's accounts.

- Aiello told the defendant that the accounts belonged to him, but in the first calls in November to Wells Fargo with the defendant on the line, Domenic Aiello identified himself as "Ronald" (the name of his father) and provided an address in Brooklyn's Chinatown. The defendant was aware that Aiello was staying at a hotel in Staten Island, and not in Brooklyn. In subsequent follow up calls with the bank, Bonanno resisted providing Aiello's full name, instead calling him "Mister Aiello" (giving "Mister" as his first name), or, at times, "Ronald." As the reversals and holds mounted, the scale of the scheme increased, rather than decreased. The defendant also gave Aiello authority to access his home mortgage account—to which Aiello made payments in the hundreds of thousands of dollars—well after payments had been put on hold or reversed.

- From the very start of the scheme (as early as mid-November), attempted payments were reversed, there were freezes on the defendant's accounts, he received account closure letters, and notices that his accounts were suspected of fraud. The defendant persisted with the scheme even after these reversals and closures.

- Aiello told Bonanno that the stolen checks were from "rental properties" owned by his late father. But he asked the defendant to drive him to pick up the checks in the middle of the night, and ran in and out of the car after pulling mail out of open mailboxes and coming back to the car with piles of mail. Aiello then made the checks out to cash in random amounts, and even made one check out to the defendant. Many of these checks bounced and the defendant continued to deposit them (surveillance video shows that the defendant made many of these deposits himself). The checks were supposedly for "rent" but Aiello would provide the defendant more than one check a month from a single person for "rent."

- The defendant was actively engaged in the scheme throughout its duration. He was in constant phone communication with Aiello and they met frequently in person. Phone records show that the defendant and Aiello were communication on the day prior to transactions, on the actual day of transactions, and the day after transactions. The defendant was also in frequent communication with his banks as payments were reversed

and accounts frozen.  After depositing checks, the defendant called the bank many times to find out when the checks would clear.  He was informed several times that there were holds on the checks or returns on the checks, but he continued to deposit them.  In call recordings with the banks, he acknowledges the increased activity on his accounts and the holds on his accounts due to suspected fraud.

- The defendant engaged in other abnormal banking activity.  As soon as transfers from Aiello were made, the defendant took cash advances with high interest rates to immediately withdraw cash before the transactions were reversed.  The defendant also tried to increase his ATM withdrawal limits, and surveillance shows the defendant making cash withdrawals from the bank.

- Throughout the scheme the defendant told Aiello to limit their communications over text message and Facebook message and periodically told him to delete any messages between them.

### B.  The Defendant's False Exculpatory Statements

One of the stolen accounts used by the defendant and Aiello to make large payments to the defendant's mortgage was stolen from a Chinese medical professionals association.  In or about March 2017, the NYPD was alerted by that association to the suspicion transfers from its account.  In the course of investigating the potential fraud, a NYPD detective called the defendant (initially thinking that the defendant might be a victim).  The defendant identified himself as a member of the NYPD.  When asked about the unauthorized transfer, he lied and said he had previously done a favor for Aiello and helped him financially over the years, and now Aiello was taking care of him in return after winning a lawsuit.  The defendant knew about the money transfers, but denied knowing they were fraudulent.

Shortly after this call, the defendant called Wells Fargo.  He told the bank that someone was calling in and setting up payments on his account out of checking accounts that were not his.  He further stated he had reported this to the police department, and that while he had authorized the person to make a one-time payment on this account, he had not been authorized to make payments after that.

Once the defendant became aware that the NYPD was investigating the fraud, he deleted his text messages and his Facebook messages.  He did not file a police report against Aiello.

### C.  The Defendant's Guilty Plea

On January 25, 2019, just days before trial was set to begin, the defendant pleaded guilty to counts one and two of the Information charging him with bank fraud and conspiracy to commit bank fraud.  In the plea agreement, the parties stipulated that the applicable Guidelines range is 37 to 46 months' imprisonment.  The Probation Department recommends a sentence of 24 months' imprisonment, which would be a downward variance of 13 months.

## II.    Discussion

A sentence within the stipulated Guidelines range is appropriate, but not greater than necessary, to reflect the nature and seriousness of the offense, the fact that the defendant committed the offense while he was actively employed as a member of the NYPD, and to promote respect for the law, and afford adequate deterrence.  *See* 18 U.S.C. § 3553(a).

### A.  A Substantial Term of Imprisonment is Warranted

Every one of the factors set forth in 18 U.S.C. § 3553(a) strongly weighs in favor of a substantial term of imprisonment.

*First*, the nature and seriousness of the offenses warrants such a sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  Over nearly five months, the defendant and Aiello conducted over sixty fraudulent transactions and exposed victims and banks to $1,457,642 in potential losses through efforts to pay the defendant's credit card debt and mortgage.  Many of those transactions were frozen or reversed, but the defendant continued to check in on whether and when transactions cleared, withdraw funds, tell Aiello to push through more transactions, and cash forged checks.  In fact, toward the end of the scheme, the defendant attempted some of his boldest maneuvers: he and Aiello attempted to make multiple six-figure payments on his mortgage in an attempt to pay it off.

In his submission, the defendant says he was "tricked" and "felt compelled to help" "out of the goodness of his heart" in response to a "sob story" from Aiello who viewed the defendant as the "perfect mark."  (Def. Mem. at 2, 13, 15-16.)  The defendant is no patsy or victim of trickery. Omitted from his description of the nature and circumstances of the offense is the defendant's financial motive.  According to the defendant's submission, Aiello was broke and homeless, but over coffee the defendant offered to loan Aiello thousands of dollars that the defendant himself would have to borrow, without a credible explanation for how Aiello would repay him, and even though the defendant had not spoken to Aiello in years before their chance encounter in the mall. That story, alone, is not plausible, and it is plainly incomplete.  The missing element: Aiello promised to pay the defendant's bills and did just that on the very day the defendant first loaned Aiello money.  The arrangement between the defendant and Aiello was highly profitable for the defendant from the get-go: in exchange for a few thousand dollars, Aiello wired tens, and later hundreds, of thousands of dollars into the defendant's accounts.  The defendant kept pushing Aiello to do transactions; he drove Aiello to steal mail; he was excited when Aiello found checks; he withdrew money quickly before transactions were reversed; and he schemed about what he would do with his financial windfall.

Indeed, the payments on the defendant's mortgage are particularly telling.  Before the defendant told Aiello to make payments on his mortgage, the defendant called his bank to ask how much it would cost to pay off his mortgage; after Aiello authorized payments, the defendant called repeatedly to check in on whether the mortgage was paid off; once the bank processed the payment, the defendant asked about getting a letter to show his wife that the debt had been paid in full; and the defendant called the bank back to ask whether he could open up a home equity line of credit

based on the newfound equity in his home.  Those are not the actions of someone who was conned or motivated by altruism.

The suggestion that the defendant was under some misimpression for any meaningful amount of time is also belied by the circumstances of the fraud.  On the earliest of calls to banks, in the presence of the defendant, Aiello referred to himself using his deceased father's name.  On subsequent calls, the defendant – clearly aware that what he was doing was wrong and attempting to conceal that from the bank – referred to Aiello using Aiello's father's name and, on at least one occasion, when pressed by the banker for Domenic Aiello's first name, dissimulated by calling him "Mister Aiello."  The defendant was then confronted with transaction reversals, account freezes, and questions from bankers.  And then he started cashing checks made out to "cash" or "Bonanno," all from the accounts of Chinese-American individuals that the defendant and Aiello had no apparent connection to.

The defendant also attempts to minimize his conduct by noting that the actual loss in this case was only $15,686.22, and that he paid approximately $15,000 to Aiello.  But the defendant should not be rewarded for the fact that, despite their best efforts and repeated attempts, the scheme was ultimately not that successful or profitable.  For most inchoate crimes there is no actual loss, but the Guidelines deliberately do not differentiate between attempted and completed crimes.  And here, while the stipulated Guidelines amount is $1,457,642, the defendant and Aiello attempted $2,438,555.34 in 63 transactions between November 14, 2016, and February 10, 2017, by repeatedly attempting large payments on the defendant's mortgage.[1]  Thus, the defendant's conduct is different (and worse) than a defendant who attempts a large one-time fraudulent transaction.  In this respect, the Guidelines do not even account for the fact that the defendant's criminal conduct was pervasive and repetitious over a number of months.

*Second*, the characteristics of the defendant, specifically the fact that he was a detective with the NYPD, are an aggravating factor in this case.  *See* 18 U.S.C. § 3553(a)(1).  By becoming an NYPD officer, the defendant chose to enter a profession that required him not only to follow the law, but to play an important part in upholding it.  The defendant was a veteran detective in the NYPD.  He worked on the Grand Larceny Task Force and for Crime Stoppers, and it appears he "served faithfully as a member of the NYPD" in those roles (Def. Mem. at 2), until he didn't.  Instead of upholding the law, the defendant conspired with Aiello to participate in the type of criminal activity investigated by the Grand Larceny Task Force and victimized the New Yorkers that the Crime Stoppers unit is supposed to protect.  In so doing, the defendant thoroughly undermined the respect for the law that he should have been cultivating.

Public corruption in any form undermines the rule of law, the function of government, and the public's faith in these institutions.  But it is particularly harmful when it is perpetrated by individuals tasked with protecting the safety and wellbeing of the community and enforcing the criminal laws.  This particular crime is not just about the financial harm the defendant inflicted on

---

[1] The parties and the PSR determined that the intended loss amount in this case was $1,457,642 and not $2,438,555 because while the defendant and Aiello attempted $2,438,555 in transactions, he never could have caused a loss greater than the value of his outstanding debt (*i.e.*, with respect to his mortgage, he could not have caused a loss greater than the value of his mortgage).

victims, but also the abuse of trust and the undermining of the purpose of the NYPD in a manner that does real damage. The New York public entrusts a significant amount of power to NYPD officers like the defendant who are charged with enforcing the laws and arresting those individuals who commit crimes. When an individual like the defendant acts in dereliction of that duty to line his pockets, a tremendous breach of trust occurs, and it breeds harmful cynicism that people have towards public institutions generally and the NYPD in particular. In so doing, criminal conduct by the defendant undermines the mission of government institutions and makes it harder for honest, well-intentioned, hard-working civil servants to do that work. And although the defendant generally did not use his position as a detective to further the scheme, when he was called by a detective investigating the crime, he did invoke his position with the NYPD as an attempt to shield his conduct from further scrutiny.

*Finally*, the need for deterrence strongly weighs in favor of a substantial sentence. *See* 18 U.S.C. § 3553(a)(2)(B). White-collar offenses, like the one perpetrated by the defendant, are difficult to detect and prosecute especially where, as here, the scheme takes advantage of shortcomings in bank transaction authentication systems and there are readily-available plausible deniability defenses available to scheme participants. *See United States v. Binday*, No. 12 Cr. 152 (CM) (S.D.N.Y. Jul. 30, 2014) ("Only if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath."); S. REP. NO. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3260 (noting with concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses"). "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After* Booker, 47 WM. & MARY L. REV. 721, 724 (2005)); *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The defendant's suggestion that he need not be sentenced to any prison time whatsoever to achieve robust general deterrence (Def. Mem. at 21-22) – notwithstanding how difficult it is to detect and prosecute successfully cases such as this – flies in the face of case law, logic, and human experience. Indeed, the approach for which the defendant advocates would lead to the perverse result that sentences in cases that have caught the public's attention, or resulted in the loss of a public position, would be the *lowest*, because those are precisely the cases most likely to involve a fall from grace that is public. The defendant does not deserve a lower sentence because what he did has garnered public attention or resulted in the loss of his job. If anything, the attention to this case militates in favor of a more significant sentence, because the sentence imposed by this Court will be known to other public employees and officials.

The defendant's submission cites articles for the purported proposition that incarceration does not lead to increased deterrent effects. (Def. Mem. at 21-22.) But there is evidence that, consistent with common sense and unscientific measures, increased punishment does in fact provide a deterrent effect. *See* Drago Francesco, Roberto Galbiati & Pietro Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence."). The studies cited by the defendant do not establish conclusively that incarceration has no deterrent value, and many are based on flawed methodologies. *See, e.g.*, Wayne N. Renke, *Book Review: Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*, 39 Alberta L. Rev. 597, 604 (2001) (concluding that von Hirsch's 1999 review of literature "can offer no grand conclusions . . . supported by incontrovertible science" while recognizing the effectiveness of deterrence in some circumstances); Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 146 (2003) (noting that von Hirsch's conclusion is not "definitive" and "simply states that the effect of sentence severity is 'less impressive' than that of certainty"); Gilbert Geis, *Definition in White-Collar Crime Scholarship: Sometimes it Can Matter*, in Proceedings of the Academic Workshop 165 (National White Collar Crime Center 1996) (criticizing the Weisburd and Benson studies for inadequately representing persons of high or respectable social status).

On the question of severity, "[p]ersons who commit white-collar crimes like [the] defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." *United States v. Stein*, No. 09-CR-377 (JBW), 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010). Because data shows that white-collar criminals "do not expect the harshest sentences to be applied in their case," a substantial sentence is necessary in white-collar cases in order to effectively deter illegal behavior. *See* John D. Esterhay, *"Street Justice" for Corporate Fraud-Mandatory Minimums for Major White-Collar Crime*, 22 Regent U. L. Rev. 135, 172-73 (2010). Moreover, to the extent the studies cited by the defendant stand for the proposition that the certainty of punishment is more important than the severity, those studies do not appear to contemplate an entirely non-incarceratory sentence.

In sum, the nature of the defendant's conduct underscores the need for a substantial period of incarceration as a means both to promote respect for the law and to deter future abuses by other public servants who would commit white-collar crimes. 18 U.S.C. § 3553(a)(2)(A) & (a)(2)(B).

## B. The Defendant's Request for a Probationary Sentence is Not Warranted

In his submission, the defendant requests a sentence of probation, with 8 months of home confinement, and community service. Such a sentence would not only be a significant variance from the stipulated Guidelines range, but also from the recommendation of the Probation Department (24 months) and the defendant's own calculation of the sentencing range without any enhancement for loss (8-14 months). When considering "the kinds of sentences available," 18 U.S.C. § 3553(a)(3), this Court should view with great skepticism a request for a non-incarceratory sentence when the Guidelines recommend a substantial prison term. *See United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007) ("When the guidelines, drafted by a respected public body with access to the best knowledge and practices of penology, recommend that a

defendant be sentenced to a number of years in prison, a sentence involving no . . . imprisonment can be justified only by a careful, impartial weighing of the statutory sentencing factors."). Such a sentence is appropriate here.

The defendant presses three principal arguments in support of his request for probation, but none warrants the extraordinary variance that he seeks. He argues, first, that the nature and circumstances of the offense do not warrant a custodial sentence, but as described above, the defendant's submission minimizes the full extent of the defendant's involvement. His role necessitates a term of imprisonment. Second, the defendant argues that a custodial sentence is not necessary to promote respect for the law and deter future misconduct. But for much the reasons set forth above, the probationary sentence that the defendant seeks would send precisely the wrong message to the public. A non-incarceratory sentence would not demonstrate that crimes such as the instant offense are taken seriously. Effective deterrence of white-collar offenses, particular offenses committed by individuals in positions of power – like the defendant was – requires incarceratory sentences that signal to other individuals who may contemplate committing similar crimes that they face substantial punishment.

*Finally*, the defendant argues that collateral consequences associated with his conviction, including the loss of his position as a police officer and the emotional toll of his convictions on him and his family warrant a non-incarceratory sentence. Collateral harm of this kind is "hardly unusual" in the white-collar setting. *United States v. Cutler*, 520 F.3d 136, 170 (2d Cir. 2008). And the "public humiliation" and other collateral effects are "ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process." *Id.* at 171. As such, "they cannot properly be viewed as fulfilling the need for the imposition of just punishment." *Id.* Similarly, "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration," *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992), but not a basis for a variance. *See also United States v. Musgrave*, 761 F.3d 602, 608-09 (6th Cir. 2014) (impermissible for the district court to rely heavily on the fact that the defendant had already "been punished extraordinarily" through years of legal process, the loss of his CPA license, and his felony conviction). There is nothing about the defendant's personal circumstances, the loss of his position with the NYPD, or the other collateral consequences that come from being a convicted felon that entitle him to the extraordinary sentence that he seeks. As set forth above, if anything, there are aggravating circumstances here not fully captured by the Guidelines range—the defendant's job with the NYPD, the sustained nature of the scheme, the defendant's persistence even as the scheme was unraveling, the dramatic escalation in the size of the attempted transactions, and the defendant's belated efforts to cover his tracks, including by lying to an investigator and deleting communications about the scheme.

### III.   **<u>Conclusion</u>**

For the reasons set forth above, the Government respectfully requests that this Court impose a substantial term of imprisonment, one within the stipulated Guidelines range.


Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


by: <u>/s/_____</u>
Nicolas Roos
Danielle R. Sassoon
Assistant United States Attorneys
(212) 637-2421/-1115